NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CYNTHIA CICCONE et al., | |
|     Plaintiffs, | |
|     v. | |
| WORLD SAVINGS BANK, F.S.B., WACHOVIA CORP., WACHOVIA MORTGAGE, WACHOVIA BANK, WELLS FARGO BANK, JOHN DOES 1-10 (fictitious), and ABC Corp. No. 1-10 (fictitious), | Civil Action No. 3:12-CV-01661-PGS-TJB |
| | **MEMORANDUM DECISION & ORDER** |
|     Defendants. | |

Presently before the Court is a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) brought by Wells Fargo Bank, N.A. ("Wells Fargo") on behalf of itself and World Savings Bank, FSB ("World Savings"), Wachovia Corp. ("Wachovia"), Wachovia Bank, and Wachovia Mortgage (collectively referred to as "Defendants"). Defendants seek to dismiss Plaintiffs Clare and Cynthia Ciccone's (collectively referred to as "Plaintiffs") complaint stemming from a home mortgage transaction between Plaintiffs and Defendants. Defendants argue that Plaintiffs have failed to state any claims for which relief may be granted. For the reasons that follow, the Court grants Defendants' motion and dismisses the case with prejudice.

### I.  BACKGROUND

Plaintiffs' complaint (the "Complaint")[1] generally alleges that Defendants defrauded Plaintiffs by making misrepresentations and material omissions concerning a mortgage loan from

---

[1] All references to the "Complaint" are to Plaintiffs' Amended Complaint, filed December 27, 2012, dkt. entry no. 26.

Defendant World Savings to Plaintiff Clare Ciccone. Along with World Savings, the Complaint names as Defendants Wells Fargo, which is the successor in interest to World Savings,[2] and a number of other entities alleged to be Wells Fargo: Wachovia, Wachovia Bank, and Wachovia Mortgage.[3]

According to the Complaint, Cynthia Ciccone purchased a home located at 12 Mine Brook Road, Colts Neck, New Jersey in 1996 without a mortgage ("the Property"). Cynthia Ciccone's name is listed on the Property's deed of title along with the names Sheri Bethune and Clare Ciccone. This was Clare Ciccone's secondary residence. On September 7, 2007, Clare Ciccone obtained a $350,000 loan from World Savings ("the Loan"), and signed a promissory note ("the Note") promising to repay. *See* Note, Kim Certif. Ex. B. That same day, both Plaintiffs, along with Sherri Ciccone-Bethune and Theodore Bethune, executed a mortgage ("the Mortgage") against the Property, which granted the lender World Savings rights in the Property tied to the promises in the Note. *See* Mortgage, Kim Certif. Ex. C. Defendant Wells Fargo later acquired the Loan and Mortgage, and defendant Wachovia Mortgage serviced the Loan. The Loan and Mortgage are the subject of the current dispute.

At the time the Loan was made, the Property was valued at $1,900,000. *See* Complaint ¶ 46; Loan Application, Kim Certif. Ex. A. The Property was originally purchased without a mortgage, but Clare Ciccone and Sheri Bethune had obtained at least one home equity loan from Wachovia for $80,000 in 2005. When the World Savings Loan closed in 2007, disbursements of $80,318 and $147,411 were made to Wachovia to pay off the existing home equity loan and

---

[2]    World Savings Bank, FSB, is the creditor named on the loan documents. Effective December 31, 2007, World Savings Bank, FSB changed its name to Wachovia Mortgage, FSB. Wachovia Mortgage, FSB was subsequently acquired by and merged into Wells Fargo Bank, N.A effective November 1, 2009. *See* Kim. Certif. ¶ 14, Ex. J.
[3]    The Complaint also names as defendants ABC Corp. No. 1 and John Doe No. 1, fictitious names for the mortgage broker involved in this transaction and the broker's supervisor.

other debt.[4]  In total, the disbursements to Wachovia and other creditors including Visa,

American Express, Bank of America, and Citi, amounted to $326,140.29.  There was also a cash

disbursement made to Plaintiff Clare Ciccone of $16,589.  HUD-1 Settlement Statement, Kim

Certif. Ex. D.  The total settlement charges were $7,270.

The Loan, which World Savings called a "Pick-A-Payment" loan,[5] is what is sometimes

referred to as an Option ARM loan.  The Complaint alleges that generally under these types of

loans borrowers are allowed to make only minimum payments each month if they choose.

Making only the minimum payments, however – at least for a period of time early on in the life

of the loan when the minimum allowable payments amount to less than the interest due – results

in negative amortization, *i.e.*, a situation where unpaid interest is added to the principal.  The

minimum payments increase over time, sometimes drastically, so as to eventually cover both

principal and interest, including the additional principal that accrued over the first several years.

According to the Complaint, the minimum payments over the first four years of the Loan would

total $76,690, while the accrued interest would total $110,950; thus, after the first four years the

principal would rise from $350,000 to $384,260.  Although the exact payments may have been

subject to change because of the flexible nature of the Loan, a payment schedule that assumes

only minimum payments are made would be roughly as follows:

---

[4] The documents before the Court suggest that the $147,411 disbursement to Wachovia was to pay off another mortgage loan, but it is not clear if this was a second mortgage on the Property, or if it was a mortgage on a different property.

[5] Several of the loan documents call the loan a "Pick-a-Payment" loan.  Plaintiffs allege that the loan was "marketed to Clare Ciccone" as a "Pick-A-Payment" loan, although beyond the loan being referred to as a "Pick-A-Payment" loan on the loan application, it is not evident from the Complaint how the loan was otherwise "marketed" as such, or by whom.

| Year | Monthly Payment |
|------|-----------------|
| 1 | $1428 |
| 2 | $1536 |
| 3 | $1650 |
| 4 | $1775 |
| 5 | $1908 |
| 6 | $2051 |
| 7 | $2205 |
| 8 | $2370 |
| 9 | $2548 |
| 10 | $2739 |
| 11-30 | $3218 |

**Plaintiff's Default**

The Complaint states that after four years of making loan payments, Clare Ciccone could not afford the higher minimum monthly payments. Ciccone failed to make the payment due on February 1, 2011, and the loan went into default. Wachovia would not accept Clare Ciccone's offer of payments below the minimum. On March 23, 2011, Wachovia sent Ciccone a letter stating that its records indicated that Ciccone had failed to make the previous two mortgage payments, and that the Loan was in default. Wachovia informed Ciccone that if she did not pay $7,837.99 by April 27, 2011, the lender would refer the account to an attorney to begin foreclosure proceedings. Plaintiffs did not cure the alleged default, and then filed an action on January 30, 2012 in the Superior Court of New Jersey, Law Division, Monmouth County. No foreclosure proceedings were ever initiated. *See* Order Vacating Order to Show Cause, dkt. entry no. 16. Then, on June 13, 2012, Plaintiff Cynthia Ciccone paid off the loan by borrowing $470,000 at a 4% interest rate with no points, thus avoiding the threatened foreclosure.

**Plaintiffs' Allegations**

The Complaint generally alleges that through misstatements, omissions, and falsification of the Loan Application, Defendants induced Clare Ciccone to enter into the Loan and both Plaintiffs to sign the Mortgage, which were on bad or unfair terms for Plaintiffs but beneficial to Defendants. Defendants allegedly had knowledge through the loan application process that Clare Ciccone could not pay the mortgage after the first four years because the payments would be too high as compared to her liabilities and income. The Complaint also alleges that Defendants knew they would obtain all of the equity in the property when Clare Ciccone eventually defaulted on the Loan and Defendants foreclosed. And the Complaint alleges that Defendants benefited from the arrangement because under generally accepted accounting principals the entire interest payment due could be booked as income even when only the minimum amount was paid, which "generate[s] phantom profits, thereby boosting the stock price." ¶ 50.

**Alleged Falsification of the Loan Application**

The claims in the Complaint generally center on the loan application and closing process, particularly on what was allegedly said – and not said – to Plaintiffs about the terms of the loan. There is also an allegation that a World Savings employee falsified a portion of the loan application. The Complaint states that World Savings "took the loan application" from Clare Ciccone by telephone on or about August 1, 2007. Complaint ¶ 27. However, it is undisputed that the only loan application that Clare Ciccone ever signed was dated September 6, 2007. *See* Uniform Residential Loan/Equity Line of Credit Application, Kim Certif. Ex. A. The Complaint alleges that on the August 1, 2007 call, Clare Ciccone informed Paul Helmandollar, the World Savings employee she spoke with, that her then-present liabilities totaled $630,820. However,

the Complaint alleges that "Hermandollar only identified $4,500 as Clare Ciccone's 'total liabilities' on the loan application in order to obtain approval for the loan." *Id.* ¶ 30.

The loan application that Clare Ciccone signed on September 6, 2007 listed individual liabilities totaling over $630,000 in a signed addendum, also dated September 6, 2007, which is referred to in the body of the loan application. The field in the loan application where the applicant is supposed to list information about current liabilities, including the name and address of creditors, unpaid balances, and monthly payment amounts, is populated with the words, written in upper-case bold letters: "SEE ADDENDUM". However, beneath the blank fields where information about individual liabilities was meant to be written (which information appears in the addendum), "Total Liabilities" are listed as only $4,500. Compounding this apparent inaccuracy, Clare Ciccone's "Net Worth" as listed in the application is derived from the apparently inaccurate $4,500 in liabilities; the "Net Worth" is listed as $2,732,500, which is the amount listed as her "Total Assets" – $2,737,000 – minus the inaccurate $4,500 in liabilities. Although this is not specifically alleged in the Complaint, if Ciccone's net worth had been listed using what Plaintiff alleges was the correct amount of total liabilities, the application would have stated $2,106,180 as Ciccone's net worth instead of $2,732,500.[6]

The Complaint also alleges that "Helmandollar and defendants purposely misidentified this loan as a 'conventional loan' on the application instead of a 'negative amortization' loan," and that they "purposely misidentified this loan as a 'refinance' in order to obtain approval for the loan." The Loan Application does identify the "Mortgage Applied For" as "Conventional", where the other choices are "VA", "FHA", "USDA", and "Other (explain)". The Loan Application also identifies the "Purpose of the Loan" as "Refinance", where the other choices are

---

[6] The Loan Application also lists Clare Ciccone's then-monthly income as $13,500; Plaintiffs have not disputed the accuracy of this representation.

6

"Purchase", "Construction", "Construction-Permanent", "Equity Line of Credit", and "Other (explain)".

At the very top of the Loan Application's first page, directly below the title "Uniform Residential Loan/Equity Line of Credit Application", the application states: "This application is designed to be completed by the applicant(s) with the Lender's assistance." At the end of the application, Clare Ciccone certified that all of the information contained in the loan application was "true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information may result in civil liability, including monetary damages. . . ."

**Alleged Misstatements and Omissions Concerning Terms of the Loan**

The Complaint alleges that defendants made false statements and omissions to induce Plaintiffs to enter into the loan. In general, the Complaint alleges that by calling the Loan a "Pick-A-Payment" loan, Defendants were suggesting that the borrower could pick their payment amount if they could not afford a higher payment. For example, the Complaint alleges that Hermandollar informed Clare Ciccone on the August 1, 2007 call that "she could continue to request a lower payment (initial minimum payment) that she could afford during the term of the loan." Complaint ¶ 51.

The Complaint also alleges that Defendants *did not* advise Clare Ciccone of a number of things. Generally, Plaintiffs allege that the Defendants did not advise them that the mortgage payments would increase over time, that accrued interest would exceed payments such that principle would increase, or that the lender had a right to foreclose on the property in the event of default. Defendants also allegedly failed to advise Plaintiff whether the loan would be beneficial to her considering the lower interest Wachovia loans that were paid off at the time of closing.

The documents that are properly before the Court on this motion contain a number of disclosures and other relevant information. The Note that Clare Ciccone signed is titled "Fixed Rate Mortgage Note, Pick-A-Payment Loan." *See* Kim Certif. Ex. B. Directly below the title, it says, in capital letters but in font the same size as the rest of the text in the document: "THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE." The interest rate of 7.55% is clearly set out on the first page. The Note identifies the "Amount of My Initial Monthly Payments" (emphasis added) as $1,428.85, and while the Note does not contain a full payment schedule, it proceeds to immediately explain the fact of and the method of calculation of the monthly payment amount changes over time. *See* § 3. The Note also explicitly limits the unpaid principal balance to 125% or less of $350,000 (the principal originally borrowed). Finally, the Note states that "[i]n addition to the protections given to the Lender under the Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note."

The Mortgage, signed by both Plaintiffs Clare and Cynthia Ciccone, along with Sherri Ciccone-Bethune and Theodore Bethune,[7] contains the following statement in bold upper-case letters featured prominently at the top of the first page:

---

[7]     Having executed the Mortgage, but not the Note, Cynthia Ciccone, Sherri Ciccone-Bethune and Theodore Bethune appear to be "co-signors" as defined by the Mortgage, which states:

> Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor") (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the Sums Secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

*Id.* ¶ 11.

THIS IS A FIRST MORTGAGE WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY PAYMENT AMOUNT AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). . . . THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS MORTGAGE IS $437,500.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

Mortgage, Kim Certif. Ex. C. By signing the mortgage, Plaintiffs acknowledged receipt of one copy of the Note. *See id.* ¶ 16. The Mortgage also clearly states that the lender has the right to sell the secured property if there is a "Breach of Duty" by the borrower. "Breach of Duty" as defined by the agreement includes the borrower's failure to pay the full amount of each payment when due, the borrower's failure to perform any promises or agreements under the Note or Mortgage, and the borrower having made any materially false or misleading statement or omission in the Loan Application.

Plaintiffs also received other written documents in advance of closing. Several of those disclosures were received and signed by both Plaintiffs Clare *and* Cynthia Ciccone, along with Sherri and Theodore Bethune. Each Plaintiff received and signed a Federal Truth in Lending Disclosure that set forth the annual percentage rate and an estimated payment schedule based on the amount Plaintiff chose as her initial payment for the first year, which was $1,428.85. The Federal Truth In Lending Disclosure, which both of the Plaintiffs and all the mortgagees received and signed, lists among other things the applicable finance charge, *i.e.*, "the dollar amount the credit will cost," as $669,468.42. *See* Kim Certif. Ex. F. The estimated payment schedule listed on the form assumes only minimum monthly payments are made, and it sets out monthly payment amounts for each year of the loan, which clearly show a yearly increase to more than double the initial payment in ten years.[8] Beneath the payment schedule, the form states in capital letters: "FIXED RATE PICK-A-PAYMENT: BECAUSE YOU HAVE

---

[8] The payment schedule that appears in the Federal Truth in Lending Disclosure is roughly reproduced, *supra*, p. 3.

SEVERAL PAYMENT OPTIONS, YOUR ACTUAL PAYMENTS AMOUNTS MAY BE

DIFFERENT.  PLEASE SEE THE DEFERRED INTEREST ACKNOWLEDGMENT

DISCLOSURE." *Id.*

The "Deferred Interest Acknowledgment Disclosure" referred to in the Federal Truth in

Lending Disclosure, is a document titled "World Savings Deferred Interest Acknowledgment".

Plaintiffs specifically allege that Cynthia Ciccone *did not* sign or acknowledge the World

Savings Deferred Interest Acknowledgment, and that although Clare Ciccone did receive and

sign the document, it was never explained to her in any fashion.  Clare Ciccone signed the

document, indicating that she "read and under[stood] this Deferred Interest Acknowledgment

and ha[d] been given an opportunity to discuss the deferred interest feature with a representative

from World Savings."  In addition, it states in two separate places: "If you have questions, we

encourage you to speak with a World Savings loan advisor . . . ."  Substantively, the document

explains to the recipient that the loan they are entering into,

> lets you choose how much to pay each month from among several choices on
> your billing statement.  As described below, if you make a periodic payment
> that is less than the interest owing on the loan, you will incur deferred interest
> and the principal balance of your loan will increase.

The document goes on to explain that,

> Deferred Interest (also known as negative amortization) occurs if your
> mortgage payment is not large enough to pay all of the scheduled interest due
> on your loan.  For example, if you owe $1,000 in interest in a given period but
> you make a $900 payment that is authorized by your loan, the $100 shortfall is
> deferred interest that is added to your loan balance.  In subsequent months, you
> will be charged interest on the higher principal balance.

Then, the document explains that each loan statement will typically offer the borrower four

payment options:

(1) <u>Scheduled Principal and Interest</u>, which "covers interest and principal to pay off your loan within its scheduled term. . . . When you pay this amount, you will not incur any deferred interest and you will reduce your loan balance";

(2) <u>Interest Only</u>, which "covers the interest due but does not reduce your loan balance. When you pay this amount, you will not incur any deferred interest";

(3) <u>Minimum Payment</u>, which "is the smallest amount you are allowed to pay. If you choose this option and the payment is lower than the Interest due, you will incur deferred interest which will be added to the principal balance of your loan"; and

(4) <u>15-Year Payment Plan</u>, which "covers all interest due and enough principal to pay off your loan within a 15-year term. When you pay this amount you will not incur any deferred interest, and you will reduce your loan balance."

That section also contains the following statement:

> Some options may not appear on your loan statement if your Minimum Payment is larger than the Interest Only option or equal to the Scheduled Principal and Interest option, if you have past-due payments, if options change in the future, or for other reasons.

The document goes on to explain some factors that the borrower should consider in deciding how much to pay each month, including that "it may be in your financial interest to pay more than the Minimum Payment as often as you can and to periodically pay down all or part of any accumulated deferred interest." Finally, the document explains how the Loan's limits on the amount of deferred interest that can accumulate will affect future recalculations of minimum payments: namely, that minimum payments are recalculated either on the tenth annual payment change or if the loan balance reaches the principal balance cap. In both cases, the minimum balances are recalculated to an amount that would pay down all interest and principal by the scheduled maturity date. The document explains that World Savings,

would expect that the Minimum Payment after the loan is reamortized would be higher for borrowers who have routinely selected the Minimum Payment and allowed their deferred interest balance to grow, as compared to borrowers who generally make a higher payment or have little or no deferred interest.

**Procedural History**

This action was filed in state court in January 2012. On March 23, 2012, the matter was removed from the Superior Court of New Jersey, Law Division, Monmouth Count by Order of this Court granting Defendant Wells Fargo's motion for removal based upon diversity of citizenship. On August 6, 2012, Judge Mary L. Cooper, U.S.D.J., issued an Order to Show Cause why the action should not be remanded to state court pursuant to the *Younger* abstention doctrine. *See* dkt. entry no. 13 (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982); *Younger v. Harris*, 401 U.S. 37, 43-54 (1971). Judge Cooper filed an order on August 16, 2012, vacating the Order to Show Cause and granting Wells Fargo leave to move to dismiss the Complaint. On October 3, 2012, Judge Cooper filed an Order denying Wells Fargo's motion to dismiss without prejudice because Plaintiffs indicated they wished to the amend their complaint, and on November 26, 2012, Plaintiffs were granted leave to amend the complaint. On December 7, 2012, Plaintiffs filed the Amended Complaint. The Amended Complaint alleges violations of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8–2, common law fraud and violations of the Fair Debt Collection Practices Act. On December 27, 2012, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6).

## II.    DISCUSSION

**Legal Standard**

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the

non-moving party. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). A Complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S. Ct. at 1950. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149 (2001).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949; *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *see also Iqbal*, 129 S. Ct. at 1949-50.

On a motion to dismiss the Court may not "consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997). An exception to this general rule is that the Court may consider (1) exhibits attached to the complaint, (2) matters

of public record, and (3) all documents that are integral to or explicitly relied upon in the complaint. *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) (citation omitted); *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 190 n. 3 (3d Cir. 1999); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Thus, "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997). "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion into one for summary judgment.'" *Id.* (citation omitted). Review of further materials beyond the pleadings, however, may require conversion of the motion into one for summary judgment. Fed. R. Civ. P. 12(b). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Pension Benefit Guaranty Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). Consideration of these referenced documents will not require the conversion of a motion to dismiss to one for summary judgment under Fed. R. Civ. P. 12(b)(6). "The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Id.* at 1196-97. Even if a "[c]omplaint does not explicitly refer to or cite [a document] . . . the critical [issue] is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly

cited." *Burlington Coat*, 114 F.3d at 1426 (emphasis in original) (citation omitted).

Here, the Court may consider a number of the documents that were not attached to the Complaint, but were attached to Defendants' Motions to Dismiss without converting the instant motion into one for summary judgment. The Amended Complaint clearly referenced the Loan Application, Note, Mortgage, and certain other loan documents and notices, which documents form the basis of Plaintiffs' claims. Plaintiffs do not dispute that the Note, the Mortgage, and the Loan Application are properly before the Court. Plaintiffs argue, however, that other documents the Court has taken into consideration – the HUD-1, Federal Truth in Lending Disclosure, Deferred Interest Acknowledgment, and Notice of Intent to Foreclose – are not to be considered for the purposes of this motion. All of these documents were either referenced to in the Amended Complaint or relied upon in its drafting,[9] and are central to Plaintiffs' claims. In addition, Plaintiffs do not dispute the authenticity of the documents, and Plaintiffs were certainly on notice of their contents given that at least one of the Plaintiffs signed each of the documents and given that the documents were attached to a previous motion to dismiss filed in this action.

**Fraud Claims**

Plaintiffs assert both common law fraud and New Jersey Consumer Fraud Act claims. In *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007), the Third Circuit elucidated Rule 9's heightened pleading standard: "Pursuant to Rule 9(b), a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.' To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* at 200 (internal citations omitted). Indeed,

---

[9] HUD-1 Settlement Statement, *see* Complaint ¶ 33; Federal Truth in Lending Disclosure, *see* Complaint ¶ 42; World Savings Deferred Interest Acknowledgment, *see e.g.*, Complaint ¶¶ 44-45; and Notice of Intent to Foreclose, Complaint ¶ 55.

the Third Circuit has advised that pursuant to Rule 9(b), at a minimum, a plaintiff must support his/her allegations of fraud with all the essential factual background that would accompany "'the first paragraph of any newspaper story' – that is, the 'who what, when, where and how' of the events at issue." *In re Supreme Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006)(citations omitted).  A complaint must do more than assert generalized facts, it must allege facts specific to the plaintiff.  *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658-59 (3d Cir. 1998) (where the complaint failed to allege "what actually happened to either" of the plaintiffs, the complaint did not plead "fraud with the specificity required by Rule 9(b)").  This, Plaintiffs have largely failed to do with respect to several of the Defendants.

As an initial matter, while the Plaintiffs plead their fraud claims against "Defendants" generally, the factual allegations asserted in the Complaint only discuss the conduct of World Savings and its employee Paul Hermandollar.  Although Plaintiffs bring this action against Wells Fargo (which bought World Savings and with it, the Loan and Mortgage), Wachovia, Wachovia Bank, and Wachovia Mortgage, Plaintiffs fail to make any factual allegations with respect to any parties' conduct except World Savings's, let alone allegations that amount to a plausible claim of fraud.  Plaintiffs have not identified any statements made by these Defendants, let alone the specifics of the statements or how these alleged statements were false or misleading.  Accordingly, the CFA and common law fraud claims against Defendants Wachovia, Wachovia Bank, and Wachovia Mortgage shall be dismissed for failure to comply with Rule 9(b) and under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.

Wells Fargo however, as World Savings's successor in interest, would be liable for the conduct of its predecessor entity.  Accordingly, the Court reads Plaintiffs' allegations against World Savings as pertaining also to Wells Fargo.  The Court now addresses the substance of the

common law fraud and CFA claims against World Savings and Wells Fargo.  In the CFA claim,

Count One, Plaintiffs allege that Defendants:

> "made false promises and misrepresentations concerning the amount of negative
> amortization that would be added to the principal balance each month and failed
> to inform Plaintiff Cynthia Ciccone of the terms of the loan in any fashion[;]"

> "intentionally falsified the loan application by identifying this loan as a
> 'conventional refinance' when it was a 'negative amortization loan[;]'

> "intentionally falsified the loan application by only identifying the total liabilities
> of Clare Ciccone as $4,500 instead of $630,820 in order to obtain loan
> approval[;]"

> made "false statements and promises . . . in the Note and other closing documents
> for the loans . . . ."

Complaint ¶¶ 77-80.  A number of other specific allegations related to the CFA claims pepper

the Complaint.  Plaintiffs say that the Loan Application stated that Ciccone's monthly mortgage

payment would be reduced from the payments she had been making on her loans before

refinancing, but Plaintiffs argue that the Application does not state that the mortgage payments

would then increase over the next years.  Plaintiffs complain that neither Defendants, the Loan

Ppplication, nor the Note stated that monthly payments would increase in increments to a high of

$3,213.47 per month by year ten.  Plaintiffs complain that Defendants did not inform them

"specifically or generally" that over the first four years of the loan, accrued interest would

exceed total payments such that the principle would increase by over $30,000.  Plaintiffs also

complain that the Application did not indicate that if Plaintiffs could not make the full payment,

the lender had the right to foreclose on the property.  For the following reasons, none of these

allegations individually or collectively state a plausible claim for relief under the CFA.

The CFA, is designed to address "sharp practices and dealings in the marketing of

merchandise and real estate whereby the consumer could be victimized by being lured into a

purchase through fraudulent, deceptive or other similar kind of selling or advertising practices."

*Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271 (1978). To state a case under the CFA, a

plaintiff must demonstrate three elements: (1) an unlawful practice by the defendant; (2) an

ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful

conduct and the plaintiff's ascertainable loss. *Prof'l Cleaning & Innovative Bldg. Servs. v.*

*Kennedy Funding, Inc.*, 245 Fed. Appx. 161, 165 (3d Cir. 2007); *Dabush v. Mercedes-Benz USA,*

*LLC*, 378 N.J. Super. 105, 874 A.2d 1110, 1115 (N.J. Super. Ct. App. Div. 2005). The CFA

defines an "unlawful practice" broadly as:

> The act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in connection with the sale
> or advertisement of any merchandise or real estate, or with the subsequent
> performance of such person as aforesaid, whether or not any person has in fact
> been misled, deceived or damaged thereby . . . .

N.J.S.A. § 56:8-2. "Courts have emphasized that like most remedial legislation, the [CFA]

should be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2,

15 (N.J. 1994). "Proof of any one of those acts or omissions or of a violation of a regulation will

be sufficient to establish unlawful conduct under the Act." *Id.* at 19.

Notwithstanding a liberal construction of the CFA, Plaintiffs' fail to state a plausible

cause of action. Plaintiffs' CFA allegations fail to properly allege that Defendants committed an

unlawful practice; in addition, even if Defendants' conduct rose to the level of unlawful practice,

Plaintiffs have not and cannot establish a causal connection between the allegedly unlawful

practice and an ascertainable loss. First, with regard to the unlawful practice, Plaintiffs simply

have not shown that Defendants committed either an affirmative act, such as an unconscionable

commercial practice or affirmative misrepresentation, or a knowing omission that is prohibited

by the Act. As recounted above, the affirmative acts complained of are that Defendants allegedly: made false promises about the amount of negative amortization that would be added to the principal each month; falsified the loan application by misrepresenting Clare Ciccone's liabilities and misdescribing the loan; and made false promises in the loan documents. These allegations are either belied by the facts before the Court, or do not rise to the level of unlawful conduct needed to prove a CFA violation.

Regarding alleged false promises about the amount of negative amortization each month, this allegation is unsupported by the facts before the Court; if Plaintiffs are suggesting that a particular person made false promises about the amount of negative amortization each month, that allegation has not been plead with the particularity required by Rule 9(b), because nowhere in the Complaint do Plaintiffs say who made the promises and what those promises were. If Plaintiffs are suggesting that false promises about the monthly negative amortization amount are contained in the loan documents, this Court disagrees.[10]

Regarding the allegation that Defendants falsified the loan application by misrepresenting Clare Ciccone's liabilities and misdescribing the loan as a "conventional refinance", the Court will not hold Defendants liable for alleged misrepresentations in the Application that Plaintiff Clare Ciccone certified as being true under penalty of perjury; Plaintiffs have not plead facts with particularity giving the Court reason to ascribe any misrepresentations to World Savings or its employee who according to the Application itself were supposed *to assist* Clare Ciccone in completing the application, not *complete the application for her*. In addition, even if the alleged misrepresentations can be viewed as Defendants' fault, this Court is not convinced that listing $4,500 as Ciccone's liabilities and characterizing the loan as "conventional" can be considered meaningful misrepresentations in light of the rest of the documents properly before the Court,

---

[10]      The Court will address its reading of the contents of the loan documents properly before the Court, *infra*.

including the addendum to the Application which correctly lists Ciccone's total liabilities.  Put differently, even if the "misrepresentations" are ascribed to Defendants, they cannot be the basis for a CFA claim because Plaintiff cannot draw a causal connection between these representations and any alleged loss by Plaintiffs; as discussed further below, Plaintiffs have not shown or even alleged that these representations caused World Savings to make a loan it would not have otherwise made, or that any other party would have acted differently had the Loan Application been filled out differently such that Plaintiffs would not have suffered their alleged loss.

The Court finds that the remainder of the allegations underlying the CFA claim, which as recounted above generally consist of allegations that the loan documents were either affirmatively false and misleading or were misleading by omission of certain facts, are belied by the documents before the Court.  The Court will not accept conclusory allegations when contradicted by documents incorporated in the pleadings.  *Muti v. Schmidt*, 96 Fed. Appx. 69, 74 (3d Cir. N.J. 2004).  Certain things which Plaintiffs say were omitted from the documents – for example, that monthly payments would increase over time or that Plaintiffs, that negative amortization would occur, or that if Plaintiffs could not make full payments the lender had the right to foreclose – were clearly not; the Note stated that monthly payments could change over time, that the principal balance could increase when payments did not cover interest, and that the lender could foreclose on the Property in the event of default.  Other parts of the documents that Plaintiffs say are misleading are, in the Court's view, not misleading, especially when considered in light of all of the documents received and signed by Plaintiffs.  The Court finds that in sum, the documents Plaintiffs received and signed explained the terms of the loan reasonably clearly and accurately, and Defendants were not under any duty to provide Plaintiffs with more.  The documents included a payment schedule that assumed the worst-case scenario for Plaintiffs, i.e.,

that only minimum payments would be made, and the documents also included explanations of the negative amortization aspect of the loan.

The Court also notes that in its view there is no material difference between Plaintiffs Cynthia and Clare Ciccone for the purposes of this analysis. Plaintiffs stress the fact that only Clare Ciccone received *all of the loan documents* that Defendants have put before the Court, but the only documents that Defendants have not shown that Cynthia received are the Loan Application itself and the World Savings Deferred Interest Acknowledgment. However, Plaintiffs have not shown that Defendants were under any duty to provide those two documents to Cynthia Ciccone for her review, or that absent those documents the disclosures made to Cynthia Ciccone were deficient or misleading. Cynthia Ciccone received the same payment schedule that Clare Ciccone received, and she received both the Mortgage and the Note[11], which together apprise the reader of all relevant features of the Loan.

Finally, "predatory lending", if proven, would properly be classified as an unconscionable commercial practice under the CFA. *See, e.g., Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 25 A.3d 1103, 1118-19 (N.J. 2011). Plaintiff does not specifically allege "predatory lending" using that term, but the allegation is suggested throughout the Complaint. Predatory lending has been described as:

> a mismatch between the needs and capacity of the borrower. . . . In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is little likelihood that the borrower has the capability to repay the loan.

*Assocs. Home Equity Servs. v. Troup*, 343 N.J. Super. 254, 778 A.2d 529, 536-37 (N.J. Super. App. Div. 2001) (quoting Daniel S. Ehrenberg, *If the Loan Don't Fit, Don't Take It: Applying the*

---

[11] By signing the Mortgage, Cynthia Ciccone certified that she received a copy of the Note.

*Suitability Doctrine to the Mortgage Industry to Eliminate Predatory Lending*, 10 J. Affordable Hous. & Cmty. Dev. L. 117, 119-20 (Winter 2001)).

In *Troup*, and other cases applying this concept to the CFA, plaintiffs generally alleged that lenders provided loans at unfavorable rates despite plaintiffs' being eligible for loans on more favorable terms, that lenders provided loans that borrowers could not afford because the monthly payments exceeded the borrowers' monthly incomes, or that lenders provided borrowers with loans that were not a good "fit" because they did not match the borrowers' needs. *See e.g., id; Pezza v. Wells Fargo Bank, N.A.*, 2011 U.S. Dist. LEXIS 97149, Slip Copy, 2011 WL 3847248, *1 (D.N.J. 2011). Here, none of these allegations have been properly made. Plaintiffs have not alleged that they qualified for a loan on more favorable terms than the one they received. Although Plaintiffs allege that" Defendants had knowledge through the loan application process that Clare Ciccone could not pay the mortgage after the first four years because the payment would be too high as compared to her liabilities and income," the Court will not accept this conclusory allegation; the Loan Application shows monthly income of over $13,000, well above the future monthly payments even at their highest projections of over $3,000. Finally, Plaintiffs also have not alleged that the Loan was improper because it did not "fit" the borrowers' needs in applying for the loan in the first place; the Complaint is devoid of allegations concerning her original "needs" in seeking out the Loan, or any suggestion that she communicated her needs to Defendants. It has thus not been shown that Defendants engaged in the sort of unlawful conduct – activity that was objectively misleading or outside of the norm of reasonable business practice – that would give rise to CFA liability.

Additionally, as touched on above, even if any of Defendants' conduct rose to the level of an unlawful practice under the CFA, Plaintiff cannot show a causal connection between the

practice and an "ascertainable loss".[12]  As explained above, Defendants never did foreclose on

the Property, so Defendants never lost the home.  Plaintiffs managed to obtain a new loan with

which they paid off the World Savings Loan.  Plaintiffs attempt to allege in the Complaint, and

further explain in their opposition to the motion to dismiss, that the ascertainable loss they

suffered consisted of the difference in the cost of the World Savings Loan and the cost of a loan

on more favorable or appropriate terms that they suggest they could have qualified for and would

have entered into if they had truly understood the terms of the Loan at issue.  However, Plaintiffs

cannot show that, in light of all of the disclosures and explanations of the loan terms contained in

the loan documents, any of the misrepresentations or omissions they complain of – even if

"unlawful" under the CFA – are causally connected to the increased cost of credit.  In other

words, even if World Savings made the misrepresentations Plaintiffs say it did on the August

2007 call – that Ciccone could continue to request the initial minimum payment through the life

of the loan, for example – this representation is not causally connected to the allegedly increased

cost of credit where Plaintiffs later received a number of robust and accurate disclosures and

certified to understanding them and having had the opportunity to discuss them; nowhere do

Plaintiffs allege that she asked any representative of Defendants for any further clarification

about the discrepancies between any oral or written disclosures.[13]  Likewise, even if

Hermandollar misrepresented Clare Ciccone's liabilities in the body of the Loan Application,

that misrepresentation cannot be shown to be causally connected to an increased cost of credit

for Plaintiffs under the circumstances: total liabilities were listed accurately elsewhere in the

---

[12] An "ascertainable loss" is "a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.'"  *Lee v. Carter-Reed Co. LLC*, 203 N.J. 496, 522, 4 A.3d 561 (2010) (quoting *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248, 872 A.2d 783 (2005); *see also, Reddick v. Allstate N.J. Ins. Co.*, 2011 U.S. Dist. LEXIS 145595 (D.N.J. Dec. 16, 2011). Examples of an ascertainable loss include an out-of-pocket loss.  *Id.*
[13] The Court also notes that the Complaint contains no allegations Plaintiffs could not read or write, could not speak English, or were so unsophisticated that they could not understand the numerous disclosures contained in the loan documents presented to them.

application; listing total liabilities accurately in the body of the application would not have led to a loan on more favorable terms; and Plaintiffs do not even allege that they would not have gained approval for the loan if their liabilities had been listed accurately. For all the reasons stated above, Plaintiffs fail to state a claim under the CFA and therefore Count One shall be dismissed under Rule 12(b)(6).

For similar reasons, Plaintiffs' common law fraud claim in Count Two also fails to state a claim. The five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). Plaintiffs' fraud claim fails for the same reasons that the CFA claim did. Here, as mentioned above, Plaintiffs allege generally that Defendants engaged in "misleading" practices, and failed to inform them of the full terms of the loan. However, Defendants have countered that the Plaintiffs received numerous meaningful disclosures advising them of the terms of the Loan, which included a payment schedule and an explanation of all of the loan terms. Plaintiffs have failed to show that misrepresentations occurred, that those misrepresentations were material, that Plaintiffs relied on any alleged misrepresentations, or that Plaintiffs' reliance was reasonable, particularly in light of all of the other disclosures that were made. As such, the Plaintiffs have not properly alleged fraud, and Count Two shall also be dismissed under Rule 12(b)(6).

**Fair Debt Collection Practices Act**

The Fair Debt Collection Practices Act ("FDCPA") prohibits the use of abusive, deceptive, and unfair debt collection practices by debt collectors. 15 U.S.C. § 1692, et seq. In order to successfully bring a claim under the FDCPA, a plaintiff must show that: (1) the

defendant is a "debt collector," and (2) the defendant debt collector engaged in prohibited practices in an attempt to collect a debt. *Siwulec v. Chase Home Fin., LLC*, No.Civ.A.10-1875, 2010 U.S. Dist. LEXIS 128942 (D.N.J. Dec. 7, 2010); *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000); *FTC v. Check Inves., Inc.,* 502 F.3d 159, 171 (3d Cir. 2007). A "debt collector" is defined under the FDCPA as:

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due [to] another.

15 U.S.C. § 1692a(6); *see also Pollice*, 225 F.3d at 403; *Glover v. FDIC*, 698 F.3d 139, 152 n.8 (3d Cir. 2012). Stated differently, the FDCPA applies to entities and persons that collect debts on behalf of others. As such, it generally does not apply to creditors attempting to collect debts on their own behalf. *See Staub v. Harris*, 626 F.2d 275, 277 (3d Cir. 1980) ("The [FDCPA] does not apply to persons or businesses collecting debts on their own behalf."); *Schaffhauser v. Citibank (S.D.) N.A.*, 340 F. App'x 128, 130 n.4 (3d Cir. 2009). "Debt collector", however, includes any "creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). Here, Wachovia Mortgage – the only entity named in Plaintiff's FDCPA claim – is a division of Wells Fargo, *i.e.*, the creditor to whom the debt is due. Accordingly Wells Fargo is the only entity attempting to collect a debt, and it is attempting to collect a debt on its own behalf. The language creating an exception for creditors who use any name other than their own in collecting debts is inapplicable. That language is only relevant when "a creditor or an affiliate of a creditor . . . uses someone else's name so as to suggest to the debtor that a third party is involved in the debt collection process, when in fact that party is not

involved." *Nielsen v. Dickerson*, 307 F.3d 623, 631 (7th Cir. 2002). There is no allegation that Wachovia Mortgage advertised itself as some non-existent, non-involved third-party when it took steps to collect on the Loan. Accordingly, neither Wachovia Mortgage nor Wells Fargo are "debt collectors" as defined by the FDCPA, and therefore the FDCPA claim is dismissed.

**Conclusion**

For the reasons stated above, Defendants' motion to dismiss is granted, and the claims are dismissed in their entirety. Because Plaintiffs have already been given one chance to amend the Complaint, and because the Court finds that further amendment would be futile, the claims are dismissed with prejudice.

**ORDER**

IT IS on this 15th day of May, 2013

**ORDERED** that Defendants' motion to dismiss [ECF No. 27] is GRANTED; and it is further

**ORDERED** that Plaintiffs' Amended Complaint [ECF No. 26] is dismissed with prejudice.

_s/Peter G. Sheridan_
PETER G. SHERIDAN, U.S.D.J.